# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | Sidney I. Schenkier |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1173 | **DATE** | 11/26/2001 |
| **CASE TITLE** | Oxford Capital Illinois, L.L.C. vs. Sterling Payroll Financial, L.L.C., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 01/10/02 at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** The Court finds Sterling and Mr. Kyprianou in civil contempt of the Court's 03/14/01 order. As a sanction for this contempt, the Court orders as follows: Sterling and Mr. Kyprianou will be fined in the amount of $250.00 per day (for which they will be jointly and severally liable). The fine will commence as of the date of this Memorandum Opinion and Order. Sterling and Mr. Kyprianou shall pay to Oxford its reasonable attorneys' fees and costs incurred in negotiating and attempting to implement the Agreement, and in prosecuting this civil contempt petition.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

NOV 2 6 2001
date docketed

docketing deputy initials

11/26/2001
date mailed notice

**Document Number**

39

JJK    courtroom deputy's initials

01 NOV 26 AM 9: 04

Date/time received in central Clerk's Office

JJK
mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| OXFORD CAPITAL ILLINOIS, L.L.C., an Illinois limited liability corporation,<br><br>Plaintiff,<br><br>vs.<br><br>STERLING PAYROLL FINANCIAL, L.L.C., a New York limited liability corporation, STERLING BUSINESS SOLUTIONS INC., formerly known as VIRTUAL REALITY, INC., a New York corporation, and NICK KYPRIANOU, an individual,<br><br>Defendants. | No. 01 C 1173<br><br>Judge James B. Moran<br><br>Magistrate Judge Schenkier |

**DOCKETED**
NOV 2 6 2001

## MEMORANDUM OPINION AND ORDER

On April 23, 2001, Oxford Capital Illinois, L.L.C. ("Oxford"), filed a Petition for Rule to Show Cause ("Petition"), requesting that this Court hold defendants Sterling Payroll Financial, L.L.C. ("Sterling") and Nick Kyprianou ("Mr. Kyprianou") in civil contempt for failing to comply with the terms of an order issued by this Court on March 14, 2001 ("the March 14 Order"). By consent of the parties, pursuant to 28 U.S.C. § 636(c), all proceedings concerning the March 14 Order (and the settlement agreement incorporated therein by reference) have been assigned to this Court for all purposes (*see* doc. # 13). For the reasons set forth below, the Court grants the Petition, and holds both Sterling and Mr. Kyprianou in civil contempt.

39

# I.

Oxford is a Chicago-based limited liability company in the business of factoring accounts receivable ( Pl.'s Motion for Temporary Restraining Order ("TRO Motion") ¶ 2).[1] Sterling is a New York limited liability company in the business of employee leasing (Complaint ¶¶ 2, 8).[2] Mr. Kyprianou is Sterling's managing member, and Chief Executive Officer (Complaint ¶ 4).

On February 21, 2001, Oxford brought this action against Sterling, Mr. Kyprianou, and Sterling Business Solutions, Inc. ("SBS"); SBS is not a subject of the Petition. Oxford's complaint alleged that Sterling had violated several of the terms of a Master Factoring Agreement ("Factoring Agreement") entered into by the parties on March 7, 2000 (Complaint ¶ 20). That Factoring Agreement assigned to Oxford the exclusive right to purchase Sterling's accounts receivable, and required Sterling, through express warranty, to secure the integrity of any of the accounts receivable Oxford might choose to purchase (Factoring Agreement ¶ 1). The Factoring Agreement also required Sterling to instruct its customers to make payments on the assigned accounts to a "lock box" established for payment to Oxford (Factoring Agreement ¶ 4). In addition, the Factoring Agreement granted Oxford "a continuing first priority security interest" in all of Sterling's then-existing accounts receivable and in any of Sterling's future accounts receivable (Factoring Agreement ¶ 8). The complaint alleged that Sterling had breached the Factoring Agreement by: selling to Oxford several faulty accounts; continuing to collect payments on viable accounts sold to Oxford; and instructing certain of its customers not to pay Oxford (Complaint ¶¶ 23, 25, 26). The complaint also

---

[1]Oxford purchases accounts receivable at discounted prices from third party creditors. Oxford then becomes sole owner of the accounts, and works to process and collect the debts outstanding on each account.

[2]Sterling purchases employee contracts from its customers, and then leases the employees back to its customers. Many of Sterling's customers pay on thirty days credit, and for these customers Sterling establishes records of accounts receivable.

alleged that Sterling had transferred some of its accounts receivable to a third company, SBS, in violation of Oxford's security interest in and exclusive rights to purchase Sterling's accounts (Complaint ¶ 28).

## A. The Initial Temporary Restraining Order.

Shortly after filing its complaint, Oxford filed a motion for temporary restraining order, seeking, *inter alia*, to enjoin Sterling from collecting on any of its accounts receivable, and barring Sterling from advising its customers not to make payments on their accounts to Oxford (TRO Motion ¶ 30). On February 26, 2001, the presiding district judge granted Oxford's motion, and entered a temporary restraining order enjoining Sterling and Mr. Kyprianou from: (1) collecting on or otherwise soliciting payment of any of Sterling's accounts receivable; (2) tendering or selling Sterling's accounts receivable to any party, including, but not limited to SBS, without tendering such accounts receivable to Oxford; (3) indicating to Sterling's customers that payments on their accounts should not be made to Oxford; and (4) taking any action that infringes upon or is inconsistent with Oxford's perfected security interest in Sterling's accounts receivable (Temporary Restraining Order ("TRO") ¶¶ 1-4). This restraining order, as later amended by consent of the parties, remains in effect and is binding on both Sterling and Mr. Kyprianou.

Immediately following entry of the temporary restraining order on February 26, 2001, Oxford, Sterling, and Mr. Kyprianou began settlement negotiations. On March 12, 2001, the parties attended for a settlement conference mediated by this Court, and on March 13, 2001, Oxford, Sterling and Mr. Kyprianou signed a settlement agreement ("Agreement"). On March 14, 2001, this Court entered a modified restraining order (the "March 14 Order"), which incorporated by reference the terms of the Agreement (Pl.'s Pet., Ex. A ¶ 7).

3

## B. Terms of the Agreement.

The Agreement establishes a framework for: determining the amount due Oxford under the parties' Master Factoring Agreement; collecting Sterling's accounts receivable; and reducing Sterling's alleged debt to Oxford. In order to determine the amount of debt due Oxford, Sterling was required to provide Oxford with a detailed listing of its accounts receivable created since January 1, 2000, and a detailed listing of payments received from Sterling's account debtors since January 1, 2001 (Agreement ¶ 3). Further, Oxford and Sterling were required to appoint independent auditors within 10 days, and were required to obtain written reports from those auditors within thirty days of their appointment (Agreement ¶ 1).

Pending the auditors' findings, payments by the account debtors were to be made to an escrow agent (Agreement ¶¶ 4-6). If any of the parties received payments directly from account debtors, that party was required to immediately forward those payments to the escrow agent (Agreement ¶ 8).

The Agreement contemplated that until $6,100,000 has been received by the escrow agent (or, if before then an audit established an amount due, and that amount had been received), the weekly amounts received by the escrow agent from account debtors would be at least $225,000 (Agreement ¶ 10). The Agreement contained a detailed breakdown of how the escrow agent could then disburse those weekly payments, with separate distribution formulas to apply to the first $4,700,000 received (Agreement ¶ 12) and then to the amounts received thereafter (Agreement ¶ 13(a)).

The Agreement was structured to ensure that the amounts received by the escrow agent would not be less than $225,000 per week. If the account debtors' weekly payments to the escrow

4

agent were less than $225,000, then Sterling was required to deposit with the escrow agent an amount sufficient to make up the shortfall between the amounts received from the account debtors and the guaranteed minimum of $225,000 (Agreement ¶ 10). The Agreement required Sterling to make these "shortfall payments" within one business day of receiving notice from the escrow agent of the shortfall (*Id.* ¶¶ 9,10). However, the Agreement also allowed Sterling two failures to timely make these shortfall payments without there being a material breach of the Agreement, so long as Sterling made the necessary payments within three business days of receiving notice (Agreement ¶ 11). However, any failure to make a shortfall payment within three business days, or a third failure to make the shortfall payment within one business day, would constitute a material breach of the Agreement (*Id.*). On March 14, 2001, with the agreement of the parties, the Court entered an order, extending and modifying the February 26, 2001 TRO and incorporating by reference the parties' Agreement (March 14 Order ¶ 7).[3]

## II.

A court's civil contempt power rests in its inherent limited authority to enforce compliance with court orders and ensure that judicial proceedings are conducted in an orderly manner. *Jones v. Lincoln Electric Co.*, 188 F.3d 709, 737 (7th Cir. 1999). A court may impose sanctions for civil contempt in order to coerce compliance with a court order or to compensate a complainant for her loss as a result of the contemptor's non-compliance. *Grove Fresh Distrib., Inc. v. John LaBatt Ltd.*, 888 F.Supp. 1427, 1435 (N.D. Ill. 1995), *aff'd.*, 134 F.3d 374 (7th Cir. 1998). Where compensation

---

[3]On that same date, the Court issued a separate order dismissing SBS, with leave for Oxford to reinstate the case against SBS. This order also required SBS to turn over a list of any customers whose accounts SBS received from or shared with Sterling. The order further required Oxford to refrain from soliciting any of the customers provided in the SBS listing with whom Oxford did not have a business relationship. This separate order is not at issue in the Petition.

is intended, a fine may be imposed payable to the complainant. *Connolly v. J.T. Ventures*, 851 F.2d 930, 932 (7th Cir. 1988). Courts have broad discretion in choosing the means to grant such relief, and compensation may include an award of attorney's fees and costs for preparing and prosecuting a contempt petition. *Grove Fresh*, 888 F.Supp. at 1436. Where the court seeks to remedy ongoing disobedience with an order, a civil fine may be imposed as a coercive sanction against the contemptor that can be purged through full, timely compliance with the order. *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 829-30 (1994).

In order to support a finding of civil contempt, "the district court must be able to point to a decree from the court which set[s] forth in specific detail an unequivocal command which the party in contempt violated." *Jones*, at 738; *see also United States v. Dowell*, 257 F.3d 694 (7th Cir. 2001). Unlike criminal contempt proceedings which require a jury trial and contemplate punitive sanctions, a court is authorized to impose civil contempt sanctions upon the court's own finding that a party has violated the court's unequivocal command by clear and convincing evidence. *Dowell*, at 699.

Here, Oxford argues that Sterling and Mr. Kyprianou should be held in civil contempt because they allegedly violated Court orders in two separate ways: *first*, by breaching the terms of the Agreement, which was incorporated into this Court's March 14 Order and thus carried the force of a court order; and *second*, by attempting to interfere with Oxford's efforts to collect from account debtors, which Oxford says independently violates the March 14 Order. The parties have not sought an evidentiary hearing on the Petition, but have been content to address the issues raised solely by way of written submissions. All the parties' written submissions have been received and considered, and so on the record presented, we address each of Oxford's contentions in turn.

6

## III.

Oxford contends that the Sterling and Mr. Kyprianou have breached the Agreement, and thus have violated the March 14 Order, in three ways. *First*, Oxford asserts that Sterling has failed to make deposits to the escrow agent to make up for shortfalls in collections from account debtors. *Second*, Oxford claims that Sterling has failed to furnish Oxford with a detailed listing of its accounts receivable created since January 1, 2000. *Third*, Oxford complains that Sterling has provided Oxford no information regarding the appointment of an independent auditor, and that no date has been established for the audit of Sterling's finances contemplated by the Agreement.

### A. Shortfall Payments.

According to Oxford, for the week of March 23, 2001, the first week during which payments were to be made to the escrow agent under the terms of the Agreement, collections from account debtors failed to total $225,000. Similarly, collections from account debtors for the weeks of March 30, 2001 and April 6, 2001, failed to total $225,000. During each of those three weeks, Sterling purported to cover the shortfalls in each of those three weeks by tendering a check to the escrow agent for the difference between the week's collection and $225,000. However, on each of those three occasions, Sterling's check was returned for insufficient funds. For the weeks of April 13, 2001, and April 20, 2001, the escrow agent received no payments whatsoever from account debtors, and received no shortfall payments from Sterling.

Sterling does not dispute these factual assertions. However, Sterling claims that tendering bad checks for three shortfall payments, and no payment at all for two other shortfalls, is not a breach of the Agreement for two reasons. *First*, Sterling argues that its failure to make shortfall payments is the result of circumstances unforeseeable at the time it entered into the Agreement. *Second*,

7

Sterling argues that under the language of the Agreement, its failure to make shortfall payments is not a material breach. For the reasons that follow, we do not find either of these arguments persuasive.

**1.**

Sterling contends that it "was unable to provide the funds required under the March 13, 2001 Agreement due to Oxford's insistence on being paid first, before taxes . . . ." (Defs.' Resp. ¶ B(3)). According to Sterling, its customers refused to pay because "there was no commitment by Oxford Capital to pay payroll taxes for these customers' employees on a priority basis" (Defs.' Resp. ¶ B(4)), and such "failure to pay payroll taxes as the first priority" would "subject those customers to fines and penalties" from both state and federal taxing authorities (Defs.' Resp. ¶ B(5)). Sterling claims that the parties' expectation that the account debtors would agree to forward payments under the agreed framework was "misplaced" (Defs.' Resp. ¶ B(4)).

However, the fact that Sterling's and Mr. Kyprianou's expectation that the account debtors would pay $225,000 per week may have been "misplaced" does not make their failure to do so an "unforeseen circumstance" that absolved it from complying with the Agreement. One of the stated purposes of the Agreement was to establish a mechanism to "pay any unpaid taxes" (Agreement at 2). But, Sterling and Mr. Kyprianou knew that, initially, payroll taxes would not be paid as a priority out of the weekly amounts paid to the escrow agent, because that is precisely the agreement they negotiated. The parties negotiated that payroll taxes would not be paid out of the first $225,000 collected each week, until $4,700,000 had been collected (Agreement ¶ 12) -- only at that point would payment of payroll taxes come out of the first $225,000 received. (*Id.* ¶ 13(a)). Moreover, it was specifically foreseen that account debtors might not pay $225,000 per week -- that is why the

Agreement provided that Sterling would make up any shortfall. What Sterling really says it did not foresee is the magnitude of the shortfalls. But the consequences of any lack of foresight in that regard must rest with Sterling, and not with Oxford, which bargained for protection against shortfalls by negotiating to make Sterling pay the difference.

Moreover, even assuming that Sterling unexpectedly found it was unable to perform its obligation to pay the shortfall, the time for making that known was *before* Sterling passed three bad checks to Oxford, and then stopped tendering any checks at all. Sterling's "unforeseen circumstances" argument contains within it the premise that Sterling's conduct was not willful, and that Sterling therefore not contemptuous in failing to pay Oxford, because it had no ability to perform. But Sterling's behavior in writing and passing off bad checks undermines its claim that there was no willful violation. Even assuming that there were unforeseen circumstances not of Sterling's making, Sterling had choices about how to respond. Passing off bad checks not only was a bad choice, but a willful one. There is no evidence or argument that Sterling did not know when it wrote the checks that there were insufficient funds to cover them. That behavior, and the failure to make any shortfall payments due and owing under the Agreement, constitutes a breach of the Agreement and a violation of the March 14 Order. Moreover, the Court finds that this violation was willful, and is grounds for the entry of a contempt order.[4]

---

[4]Sterling now asks to modify the Agreement to require Oxford to pay the payroll taxes of Sterling's customers on a priority basis in an effort to induce its customers to satisfy their debt obligations (Defs.' Resp. ¶ B(8)). If there ever was a time when Sterling should have made this request, it was *before* Sterling passed bad checks and then simply stopped tendering shortfall checks at all. In any event, Sterling's request is now a moot point: the Court already has granted Oxford's request to abandon the Agreement once it became apparent that Sterling was not performing, and to reinstate the case so that Oxford could litigate its claims against Sterling and Mr. Kyprianou.

**2.**

The Court also rejects the contention that Sterling should not be held in contempt on the ground that its failure to make shortfall payments did not constitute a "material" breach of the Agreement (Defs.' Resp. ¶¶ 11-13). Sterling argues that the definition of "material breach" in the Agreement is flawed. Specifically, Sterling notes that paragraph 11 defines as a "material breach" the failure to make "necessary deposits" required by paragraph 9, but that paragraph 9 does not expressly concern "necessary deposits" (*Id.*). Instead, that paragraph is entitled "Notices by the Escrow Agent," and outlines certain notice requirements imposed to keep the parties informed about the escrow agent's weekly receipts (Pl.'s Ex. B. ¶ 9).

Paragraph 11 plainly contains an error by referring to Paragraph 9 rather than Paragraph 10. However, we do not think this typographical error is a means for Sterling to evade its obligation. Sterling and Mr. Kyprianou plainly knew that the Agreement required Sterling to make up any shortfall between the amounts paid by account debtors and $225,000 each week: that is why Sterling initially submitted checks (albeit bad ones) during the first three weeks. And, in any event, paragraph 18 of the Agreement provides that any breach not cured within 10 days is sufficiently important to allow Oxford to abandon the Agreement and pursue litigation instead. Here, the failure to make shortfall payments was never cured. Thus, whether a "material" breach as defined in the Agreement or "any other breach" as defined in the Agreement, the failure to make the shortfall payments violates a central requirement of the Agreement – and thus the March 14 Order.

### B. Listing of Accounts Receivable.

Oxford next alleges that Sterling has breached the Agreement by failing to provide Oxford with detailed listings of its accounts receivable created since January 1, 2000. Sterling claims that

it has provided Oxford with such a listing "numerous times," and points to a computer generated listing submitted to Oxford on June 6, 2001 as evidence of its compliance (Defs.' Reply Ex. B.). However, as Oxford points out, the computer listing submitted to Oxford on June 6, 2001 includes only accounts receivable in existence as of June 5, 2001. This listing does not account for receivables that might have originated and been terminated prior to June 5, 2001. Thus, Sterling has not provided Oxford with the detailed listing of its accounts receivable since January 1, 2000, as contemplated by the Agreement. In the Court's view, this failure constitutes a second breach of the Agreement, and a second violation of the March 14 Order. Moreover, Sterling fails to offer an explanation that would indicate that this plain violation was anything other than willful.

### C. The Audit.

Oxford's Petition also alleges that Sterling refused to comply with terms of the Agreement requiring the appointment of independent auditors to assess the amount Sterling owes Oxford under the parties' original Factoring Agreement. Oxford argues that while Sterling claims to have appointed an auditor, Sterling has failed to have an audit conducted, and has also failed to respond to Oxford's requests to set a date for the audit (Pl.'s Pet. ¶ 11). In response, Sterling only reiterates that it has appointed Ernst & Young as its auditor "for purposes of Paragraph 1" of the Agreement (Defs' Resp. ¶ 10).

Paragraph 1 of the parties' Agreement contemplates that both parties would appoint independent auditors within 10 days of signing the Agreement, and further contemplates that audits would take place, and final reports assessing Sterling's debt to Oxford would issue within 30 days of the auditors' appointment. It is undisputed that Sterling failed to comply with this time line. In fact, Sterling does not dispute Oxford's contention that it has yet to conduct an audit and has ignored

Oxford's repeated requests for initiating an audit. Thus, regardless of its claim to have retained Ernst & Young as a potential auditor, Sterling has fallen far short of its obligations under Paragraph 1 of the Agreement. Sterling has failed to offer any explanation that would show this clear violation was not willful. The Court considers Sterling's resistence to submit to an audit a breach of the Agreement, and thus finds a third willful violation of this Court's March 14 Order.

### D. Mr. Kyprianou.

Oxford's Petition seeks to hold both Sterling and Mr. Kyprianou in contempt, and attributes to Mr. Kyprianou responsibility for Sterling's non-compliance with the Agreement (Pl.'s Pet. 4-5). Mr. Kyprianou first denies that Oxford's complaint contains any allegations of violations of the Court's March 14 Order (Defs.' Resp. ¶ A(1)), but that argument is a non-starter. The March 14 Order explicitly states that the Agreement "is attached to and incorporated in this Order" (Agreed Order ¶ 7). Moreover, the Agreement itself provides that "(T)his Agreement is being entered into in connection with and shall be implemented in accordance with an order of the Court" (Agreement ¶ 26).

Mr. Kyprianou also argues that the March 14 Order does not require him to perform any action personally under the March 13 Agreement (Defs.' Resp. ¶ A(2)). In particular, Mr. Kyprianou denies that the March 14 Order "contains any guarantee or undertaking" on his part to perform any of the actions that Sterling is required to perform under the Agreement. Mr. Kyprianou's reading of the Agreement is plainly wrong. Mr. Kyprianou is a signatory to the Agreement, and is included along with Oxford and Sterling in the Agreement's definition of "the Agreement Parties" (Pl's Ex. B 2). As an "Agreement Party" Mr. Kyprianou is bound by the obligations imposed by paragraphs

2, 4, and 8, which impose duties on the Agreement Parties (*See* Pl.'s Ex. B).[5] Mr. Kyprianou also

is explicitly required under paragraph 5 to use "commercially reasonable efforts" to solicit collection

of Sterling's relevant accounts receivable (*See Id.*). However, these personal obligations under the

Agreement are irrelevant to Oxford's Petition: Mr. Kyprianou is not explicitly (and personally)

required under the Agreement to make shortfall payments, to submit to an independent auditor, or

to procure a list of Sterling's accounts receivable.

Nevertheless, Mr. Kyprianou is bound to ensure that Sterling carries out its obligations.

Although the Agreement does not explicitly require him to personally guarantee Sterling's

performance, Mr. Kyprianou nonetheless must uphold his duties as a corporate officer of Sterling:

> It is well settled that a command to the corporation is in effect a command to those
> who are officially responsible for the conduct of its affairs. If they, apprised of the
> writ directed to the corporation, prevent compliance or fail to take appropriate action
> within their power for the performance of the corporate duty, they, no less than the
> corporation itself, are guilty of disobedience, and may be punished for contempt.

*Connolly v. J.T. Ventures*, 851 F.2d 930, 934 (7th Cir. 1988) *quoting Wilson v. United States*, 221

U.S. 361, 376-77 (1911); *accord United States v. Seetapun*, 750 F.2d 601, 607 (7th Cir. 1984).

Mr. Kyprianou personally attended and actively participated in the negotiations that resulted

in the Agreement. Mr. Kyprianou was represented by counsel during those negotiations. In signing

the Agreement, Mr. Kyprianou further represented that he had read the Agreement and knew what

it contained (Agreement ¶ 22), and that he agreed to be bound by all of its terms (Agreement ¶ 23).

---

[5]Under paragraph 2, Mr. Kyprianou is bound to accept any amount that an independent auditor might determine to be due Oxford pursuant to the Factoring Agreement. Under paragraph 4, Mr. Kyprianou agrees to be bound by the Court's selection of an escrow agent in the event that the parties cannot choose one through mutual agreement. Under paragraph 8, Mr. Kyprianou was required to provide notice to Sterling and Oxford in the event that he received direct payment from one of Sterling's relevant account creditors. He was also required immediately to forward to the escrow agent any such direct payment he might receive.

In these circumstances, there can be no doubt that Mr. Kyprianou was well "apprised" of Sterling's

obligations to Oxford and to this Court. As Sterling's chief executive officer, Mr. Kyprianou was

directly responsible to take the action appropriate to ensure that Sterling met those obligations. As

Mr. Kyprianou has failed in his duty to do so, he also has failed to comply with the clear commands

of this Court and may be punished for contempt.

## IV.

In addition to incorporating by reference the Agreement, this Court's March 14 Order

modified and extended the TRO issued on February 26. (*See* Pl.'s Ex A. ¶¶ 1-4). Specifically, the

March 14 Order, which remains binding on the parties, enjoins Sterling, Mr. Kyprianou and Oxford

from receiving any of Sterling's accounts receivable originated prior to March 6, 2001, "unless the

payment is made by check payable to the escrow agent" (Pl.'s Ex. A. ¶ 1). Further, Sterling, Mr.

Kyprianou, and Oxford are enjoined from attempting to "compromise or settle the amount of any

Sterling Account Receivable with an account debtor without the consent of each of the others." (Pl.'s

Ex. A. ¶ 3). The March 14 Order also enjoins Sterling and Mr. Kyprianou from "taking any action

that infringes upon or is inconsistent with Oxford's claim in Sterling's Accounts Receivable" (Pl.'s

Ex. A. ¶ 4).

Oxford alleges that Sterling and Mr. Kyprianou "entered into a forbearance agreement on or

about March 21, 2001 with an account debtor in violation of the [March 14] Order" (Pl.'s Reply 1-

2). Oxford also alleges that in connection with the forbearance agreement, the account debtor

purporting to settle his claim with Sterling has made payments to Sterling, which Sterling "failed to

account for or provide to the escrow agent, the Court or Oxford" (*Id.*). In support of its allegations,

Oxford submits an excerpt of the forbearance agreement (Pl.'s Reply Ex. A). The defendants have not denied -- or responded – to Oxford's allegations.

The forbearance agreement, which specifically contemplates direct payment to Sterling without mention of the escrow agent, and which represents Sterling's attempt to settle a claim with one of its account debtors without Oxford's consent, on it face violates the March 14 Order. This attempt by Sterling to collect from its account debtors under the shadow of controversy with Oxford stands in direct contrast to this Court's order explicitly forbidding Sterling and Mr. Kyprianou from attempting to compromise or settle Sterling's accounts, or from taking any action inconsistent with Oxford's claim in Sterling's accounts receivable. In the absence of any explanation from Sterling and Mr. Kyprianou, who have offered none, the Court finds that this clear violation of the March 14 Order was willful.

Nor can Sterling and Mr. Kyprianou claim that they were entitled to abandon the escrow agent procedure because Oxford (after Sterling on multiple occasions failed to make required shortfall payments) asked the Court to allow it to abandon the Agreement and to reinstate the litigation. The forbearance agreement is dated a bare eight days after the Agreement was signed, and seven days after the Agreement was incorporated into the March 14 Order. The Agreement was in full force and effect when Sterling and Mr. Kyprianou entered into the forbearance agreement. And even if that had not been so, the March 14 Order, independent from the Agreement, required Sterling and Mr. Kyprianou not to take actions inconsistent with Oxford's claims in the accounts receivable. The forbearance agreement violated that obligation.

What is even more troubling is that Sterling's refusal to comply with the March 14 Order does not appear to be limited to this one forbearance agreement. In further support of the Petition,

during a status conference in September 25, 2001, Oxford submitted an August 14, 2001 letter addressed to Sterling's present and former clients, and signed by Mr. Kyprianou. The letter states: "(I)t is our belief that the amounts to which Oxford is alleging it is entitled are grossly inflated." The letter further reads: "I advise you not to attempt to negotiate any of these claims on your own." Mr. Kyprianou does not deny that he signed and sent that letter. The Court finds that this letter – dated while this Petition was pending – plainly is "inconsistent with Oxford's claim in Sterling's Accounts Receivable." Counsel for Sterling and Mr. Kyprianou declined an opportunity to submit a brief or evidence to explain this letter, and the oral explanation offered by counsel at the status conference does not persuade the Court that this letter comported either with the letter or spirit of the March 14 Order. In the Court's view, the letter represents a willful disregard of the March 14 Order.

## V.

Having found Sterling and Mr. Kyprianou in contempt of the March 14 Order, the Court now considers the appropriate sanction, mindful that the purpose of a civil contempt sanction must not be punitive, but rather compensatory, to redress harm that has been caused, *South Suburban Housing Center v. Berry*, 186 F.3d 851, 854 (7th Cir. 1999); *In the Matter of Maurice*, 73 F.3d 124, 127, 128 (7th Cir. 1995), or coercive, in order to secure further compliance. *South Suburban Housing Center*, 186 F.3d at 854. In light of these principles, we consider the appropriate sanctions for the two separate items of contempt here: the violation of the Agreement, which was incorporated into the March 14 Order, and the violation of separate terms of the March 14 Order.

## A.

As the Court has found, Sterling willfully violated key terms of the Agreement, which was incorporated into the March 14 Order and which thus carried the force of that court order. In determining the appropriate sanction for that contemptuous conduct, the Court takes into consideration that a contempt penalty would not serve a coercive purpose with respect to future compliance with Agreement because the Agreement no longer is operative. After filing the Petition, Oxford asked the Court to allow the litigation to proceed and to scrap the Agreement – a request that was understandable, given the multiple instances of Sterling's tender of bad checks to make the shortfall payments and, then, the tendering of no shortfall payments at all. On May 23, 2001, the Court granted Oxford's request, and the litigation has since proceeded without either party performing under Agreement. A contempt sanction cannot coerce compliance with an Agreement that is no longer operative.

However, that does not mean that the Court is powerless to enter a contempt sanction for Oxford's willful violation of the Agreement (and thus the March 14 Order). Contempt sanctions are appropriate to compensate Oxford for the harm it has suffered by reason of the contemptuous conduct. We do not consider the failure of Sterling to make the shortfall payments or to otherwise comply with the Agreement as harm compensable as part of the contempt sanction, because Oxford has elected to pursue litigation rather than to seek to enforce the procedures set forth in the Agreement. Nonetheless, Oxford has suffered tangible harm. *First*, Oxford incurred the attorneys' fees and costs of its counsel negotiating the Agreement, which Sterling and Mr. Kyprianou then violated within days of signing it. *Second*, Oxford has incurred the attorneys' fees and costs necessary to prosecute this contempt petition, which is part of the harm that may be addressed in a

17

contempt sanction. *Grove Fresh Distributors*, 888 F. Supp. at 1436; *see also Matter of Establishment Inspection of Microcosm*, 951 F.2d 121, 125-26 (7th Cir. 1991).

Accordingly, the Court will impose as a contempt sanction for the violation of the March 14 Order stemming from the violation of the Agreement a fine in the amount of Oxford's reasonable attorneys' fees and costs incurred in negotiating the Agreement, and prosecuting this civil contempt petition. That fine will be payable directly to Oxford.

## B.

Unlike the case with the contempt stemming from Sterling's and Mr. Kyprianou's violation of the March 14 Order stemming from the breach of the Agreement, there is a coercive purpose to be served by a sanction for Sterling's and Mr. Kyprianou's contemptuous conduct in connection with the forbearance agreement and the August 14, 2001 letter to account debtors. That conduct violates prohibitions set forth in the March 14 Order that are not tied to the Agreement, and that remain in full force and effect. A civil contempt sanction here would serve the purposes of redressing the past violations of the March 14 Order, and insuring future compliance with that order.

Accordingly, the Court imposes a contempt sanction in the amount of $250 per day, against Sterling and Mr. Kyprianou jointly and severally running from the date of this Memorandum Opinion and Order, until Sterling and Mr. Kyprianou have done the following:

1. Provided an accounting to Oxford and the Court of all monies received by Sterling or Mr. Kyprianou from the account debtor who signed the forbearance agreement, and paid those monies into the registry of the Court;

2. Provided to Oxford and the Court an affidavit from Mr. Kyprianou identifying all recipients of the August 14, 2001 letter, and attesting that the listing is complete and accurate; and

3.      Provided an affidavit from Mr. Kyprianou attesting that he has sent to each recipient of the August 14, 2001 letter a corrective letter, stating that Oxford has sued Sterling and Mr. Kyprianou in connection with the accounts receivable; that a court order entered in the litigation prohibits Sterling and Mr. Kyprianou from taking any action that is inconsistent with Oxford's claim in Sterling's accounts receivable; that the August 14, 2001 letter violates that court order; that Sterling and Mr. Kyprianou have been held in civil contempt for the violation of the court order; and that Sterling and Mr. Kyprianou retract the August 14, 2001 letter. A copy of the retraction letter is to be provided to the Court in advance for approval.

Upon compliance with each of these three requirements, the $250 a day contempt penalty will come to an end, and any amounts incurred will be purged.

Consistent with the Court's earlier ruling in connection with the separate contempt finding stemming from the breach of the Agreement, the Court also will award Oxford its reasonable attorneys' fees and costs in connection with prosecuting this aspect of the petition for civil contempt. However, because the briefing and argument devoted to this aspect of the civil contempt petition were quite modest, we expect that any fees and costs attributable to this portion of the civil contempt petition likewise will be modest and will not duplicate those claimed by Oxford in connection with the civil contempt stemming from the breach of the Agreement.

## CONCLUSION

For the foregoing reasons, the Court finds Sterling and Mr. Kyprianou in civil contempt of the Court's March 14, 2001 Order. As a sanction for this contempt, the Court orders as follows:

A.    Sterling and Mr. Kyprianou will be fined in the amount of $250 per day (for which they will be jointly and severally liable). The fine will commence as of the date of this Memorandum Opinion and Order. The fine will cease to continue accruing, and all previously accrued amounts will be deemed purged, upon compliance by Sterling and Mr. Kyprianou with each of the following conditions:

1.    Sterling and Mr. Kyprianou shall provide an accounting to Oxford and the Court of all monies received from the account debtor who signed the forbearance agreement, and will pay those monies into the registry of the Court;

2.    Mr. Kyprianou shall provide to Oxford and the Court an affidavit identifying all recipients of the August 14, 2001 letter and attesting that the listing is complete and accurate; and

3.    Mr. Kyprianou shall provide an affidavit attesting that he has sent to each recipient of the August 14, 2001 letter a corrective letter stating that: Oxford has sued Sterling and Mr. Kyprianou in connection with the accounts receivable; that a court order entered in the litigation prohibits Sterling and Mr. Kyprianou from taking any action that is inconsistent with Oxford's claim in Sterling's accounts receivable; that the August 14, 2001 letter violates that court order; that Sterling and Mr. Kyprianou have been held in civil contempt for the violation of the court order; and that Sterling and Mr. Kyprianou retract the August 14, 2001 letter. A copy of the retraction letter is to be provided to the Court in advance for approval.

B.    Sterling and Mr. Kyprianou shall pay to Oxford its reasonable attorneys' fees and costs incurred in negotiating and attempting to implement the Agreement, and in prosecuting this civil contempt petition. Oxford shall present to Sterling and Mr. Kyprianou by December 7, 2001 a detailed statement setting forth the attorneys' fees (with a daily breakdown of the amount of time

20

spent and the billing rate of each attorney involved) and costs that are being sought. By December 21, 2001, Sterling and Mr. Kyprianou are to inform Oxford in writing as to what objection, if any, they have to the fees and costs sought. In the event there is objection, the parties are to meet and confer on or before January 7, 2002 to attempt to resolve those disputes.

The matter is set for a status conference on January 10, 2002 at 9:00 a.m.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated:  November 26, 2001**